Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
Telephone: (208) 724-2617
Facsimile: (208) 906-8663
chd@fergusondurham.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JACOB SPENCER FREY,<br><br>               Plaintiff,<br><br>   v.<br><br>CENTURION HEALTH, INC.; CENTURION OF IDAHO, INC; DR. MURRAY YOUNG; DR. REBEKAH HAGGARD; TONYA MCMILLIAN; PATRICK JONES; JACQUE DOLAN; SUMMER ELDREDGE, N.P.; WILLIAM ROGERS, N.P.; SELAH WORLEY, N.P.; ROBIN LARIVE, P.A.; NATHAN THUESON; HILLARY KOEHLER; CENTURION JOHN AND JANE DOES 1-5; RONA SIEGERT; TYRELL DAVIS; LT. JAMIE AYUSO; MATTHEW MILLER; SHEIKH DEEN; and IDOC JOHN AND JANE DOES 1-5,<br><br>               Defendants. | Case No.   1:23-cv-00141<br><br>**CIVIL RIGHTS COMPLAINT**<br><br>**42 U.S.C. § 1983**<br><br>**JURY TRIAL DEMANDED** |

1

## INTRODUCTION

Jacob Frey is a type-I diabetic. Since Mr. Frey came to prison in 2020, prison and medical officials have bungled, mismanaged, and ignored his repeated requests for proper medical care. There are a few simple treatments, widely available in the community, which could manage Mr. Frey's diabetes, but his providers have refused to offer them. His blood glucose and A1c levels – key markers for whether his disease is under control – have fluctuated widely. Once, medical providers and correctional officers even refused to give him insulin as a punishment for missing his afternoon pill call. That night, he suffered from hyperglycemia and developed symptoms of diabetic ketoacidosis, a condition that can rapidly lead to death.

Mr. Frey has received similarly poor-quality care for a broken ankle. Prison and medical officials have delayed his follow-up appointments with an outside orthopedic specialist for months, keeping him unnecessarily confined to a wheelchair for a year and a half. Likewise, prison and medical officials unreasonably delayed treating Mr. Frey's serious sleep apnea. These unreasonable delays caused him unnecessary pain, suffering, and a substantial risk of serious harm given his comorbidities. He seeks relief from this Court.

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction and venue over the subject matter of this

complaint under 42 U.S.C. § 1983; 28 U.S.C. § 1331 and § 1343(a)(3); 28 U.S.C. § 2201 and

§ 2202; 28 U.S.C.§  2283 and § 2284.

2.      Section 1983 authorizes civil actions for the "deprivation of any rights ...

secured by the Constitution and laws" against a party acting under color of state law. 42

U.S.C. § 1983.

**PARTIES**

3.      Plaintiff Jacob Spencer Frey has been in the legal care, custody, and

control of the Idaho Department of Correction since 2020. He is incarcerated under a

Kootenai County judgment of conviction for aggravated assault and eluding a police

officer. Mr. Frey is currently housed at the Idaho State Correctional Institution (ISCI) in

the "Medical Annex."

4.      At all relevant times, the following defendants were acting under color of

state law.

5.      Defendant Centurion Health, Inc., is a private, for-profit company

headquartered in Virginia that contracts with the Idaho Department of Correction to

provide medical care for all IDOC residents. Centurion Health is fulfilling a traditional

state function of providing medical care for prison residents. Its policies, customs, or

practices were the moving force behind the constitutional violations alleged in this case.

3

6.      Defendant Centurion of Idaho, Inc., is a private, for-profit company, with a principal residence in St. Louis, Missouri, and is a subsidiary of Centurion Health. It contracts with the Idaho Department of Correction to provide medical care for all IDOC residents. Centurion of Idaho is fulfilling a traditional state function of providing medical care for prison residents. Its policies, practices, or customs were the moving force behind the constitutional violations alleged in this case.

7.      Defendant Dr. Murray Young is a Centurion employee and the Regional Medical Director for Centurion in Idaho. He is responsible for Mr. Frey's medical care and has personally examined Mr. Frey on at least one occasion. He is sued in his individual capacity.

8.      Defendant Dr. Rebekah Haggard is a Centurion employee. She is the Medical Director at the Idaho State Correctional Institution and is directly responsible for Mr. Frey's medical care. She is sued in her individual capacity.

9.      Defendant Tonya McMillian is a Centurion employee. She is the Regional Health Services Administrator. Among other duties, she is responsible for hiring, firing, fully staffing, and ensuring adequate training for all Centurion employees working in the prisons in Idaho. She is also responsible for establishing and monitoring Centurion policies and procedures to ensure Mr. Frey and other residents receive care that is ordered by qualified health professionals. She is sued in her individual capacity for damages and official capacity for injunctive relief.

10.     Defendant Patrick Jones is a Centurion employee. He was the Health Services Administrator at the Idaho State Correctional Institution until sometime in 2022. Among other duties, he was responsible for establishing and monitoring Centurion policies and procedures to ensure Mr. Frey and other residents receive adequate medical care. He is sued in his individual capacity.

11.     Defendant Jacque Dolan is a Centurion Health employee and former employee of the Idaho Department of Correction. She has been the Health Services Administrator at ISCI since sometime in 2022. Among other duties, she is responsible for establishing and monitoring Centurion policies and procedures to ensure Mr. Frey and other residents receive adequate medical care. She is sued in her individual capacity.

12.     Defendant Summer Eldredge is a nurse practitioner and Centurion Health employee. She is the provider who is directly responsible for the care of residents with chronic conditions at ISCI, including Mr. Frey. She is sued in her individual capacity.

13.     Defendant Selah Worley is a nurse practitioner and Centurion Health employee. She is responsible for providing clinical care for residents at ISCI, including Mr. Frey. She is sued in her individual capacity.

14.     Defendant William Rogers is a nurse practitioner and Centurion Health employee. He is responsible for providing clinical care for residents at ISCI, including Mr. Frey. He is sued in his individual capacity.

15.     Defendant Robin LaRive is a physician's assistant and was a Centurion Health employee at all relevant times. She was responsible for providing clinical care for residents at the Idaho State Correctional Center, including Mr. Frey when he was housed there in the summer and fall of 2022. She is sued in her individual capacity.

16.     Defendant Nathan Thueson is employed by Centurion Health as a "Correctional Medical Specialist." He is sued in his individual capacity.

17.     Defendant "Nurse Hillary," who Plaintiff believes to be Hillary Koehler, is employed by Centurion Health as a nurse at the Idaho State Correctional Center. She is sued in her individual capacity.

18.     Rona Siegert is the Health Services Director for IDOC. She monitors and oversees all aspects of healthcare services. Her duties include ensuring the contract medical provider complies with all applicable laws, rules, and regulations. She is also the appellate authority for any grievance that involves complaints about medical providers and care. She is sued in her individual capacity for damages and official capacity for injunctive relief.

19.     Defendant Matthew Miller is employed by IDOC as a correctional officer. He is sued in his individual capacity.

20.     Defendant Sheikh Deen is employed by IDOC as a correctional officer. He is sued in his individual capacity.

21.     Defendant Lieutenant Jamie Ayuso is employed by IDOC as a correctional officer and shift commander. She is sued in her individual capacity.

22.     Defendant Tyrell Davis is the Warden at the Idaho State Correctional Institution. He is responsible for the care of all residents housed within that institution. He is sued in his individual capacity for damages and official capacity for injunctive relief.

23.     IDOC John or Jane Does 1 -5 are Idaho Department of Correction employees, whose identities are currently unknown to Plaintiff, who are responsible for off-site scheduling of medical appointments for residents within the IDOC. They are sued in their individual capacities for unreasonable scheduling delays.

24.     Centurion John and Jane Does 1 – 5 are Centurion local, regional, or national administrative employees whose identities are presently unknown to Plaintiff. These John and Jane Does have decision-making authority to approve or deny care requested by an on-site medical provider. As such they are responsible for Mr. Frey's medical care. They are sued in their individual capacities for damages and official capacities for injunctive relief.

## FACTS COMMON TO ALL CLAIMS

### Diabetes Care

25.     Jacob Spencer Frey is a type I diabetic, meaning that he is insulin dependent.

7

26.     Type I diabetes is a chronic, incurable, and serious medical condition.

27.     Mr. Frey has been diagnosed as a "brittle" type I diabetic, meaning that his blood sugar swings can be frequent and severe.

28.     If untreated, or poorly treated, type I diabetes can lead to heart disease, kidney failure, blindness, lower-extremity amputations, and death.

29.     Diabetes is the eighth-leading cause of death in the United States. CDC, National Center for Health Statistics, https://www.cdc.gov/nchs/fastats/diabetes.htm.

30.     Routine blood testing, precise dosing of medication, nutritional eating, and exercise – and the timing of these things with one another  – are critically important in the treatment of a type I diabetic.

31.     Before he went to prison in 2020, Jacob Frey's blood glucose and A1c levels were relatively well-controlled with the assistance of an insulin pump. He was permitted to use an insulin pump in the county jail.

32.     An insulin pump is a medical device that continuously administers the proper dosage of insulin to a diabetic patient. The pump can be adjusted to increase or decrease insulin, depending on blood glucose readings and anticipated carbohydrate intake.

33.     An insulin pump is a common medical device that falls squarely in the standard of care for certain brittle diabetics like Mr. Frey.

34.     But Mr. Frey has not been permitted an insulin pump since his imprisonment in the Idaho Department of Correction, despite his repeated requests.

35.     Summer Eldredge, a chronic care nurse, is one of the primary Centurion medical providers responsible for Mr. Frey's diabetes care.

36.     Beginning when Mr. Frey first entered prison and continuing until now, Ms. Eldredge has refused to order an insulin pump as part of Mr. Frey's treatment.

37.     In doing so, she has not exercised independent medical judgment. She is instead relying on "security," meaning that there is a policy or custom that prohibits an insulin pump, regardless of need.

38.     Dr. Rebekah Haggard, the Medical Director at ISCI, has also refused to order this standard and potentially life-saving treatment for Mr. Frey.

39.     Dr. Haggard is not exercising independent medical judgment in making that determination.

40.     Two years into Mr. Frey's incarceration, after his family had continually pressed for adequate care, Centurion Health's Regional Medical Director, Dr. Murray Young, finally ordered an insulin pump to be provided to Mr. Frey. In his order, Dr. Young acknowledged its necessity for Mr. Frey to control his diabetes.

41.     But Dr. Young had delayed for nearly two years before seeing Mr. Frey or taking that action.

42.     Moreover, on information and belief, a Centurion administrative John or Jane Doe overruled Dr. Young's order as it went up the chain of command and rejected the treatment.

43.     Also on information and belief, Centurion has a custom, policy, or widespread practice of not authorizing insulin pumps for diabetic care in prison, regardless of the standard of care or individual need, to save cost or for "security."

44.     Alternatively, Dr. Young simply never followed up after examining Mr. Frey to ensure his order was followed.

45.     Either way, these defendants deprived Mr. Frey of necessary medical treatment.

46.     Additionally, Ms. Eldredge has specifically informed Mr. Frey that the Idaho Department of Correction also has a custom, policy, or practice of prohibiting insulin pumps. She has not specified what is unsafe about an insulin pump.

47.     Mr. Frey's diabetes has not been well-controlled for nearly three years now, despite his repeated requests for a common medical device that had controlled his disease in the past.

48.     As a type I diabetic, Mr. Frey also must have his glucose routinely tested throughout the day as circumstances warrant. The minimum would be at least three times a day, and preferably four times.

49.     Frequent glucose testing is critical to determine the correct insulin dosage for a diabetic. It is also important to know a patient's glucose level so that the patient can make necessary adjustments to when he eats and the type of food that he eats.

50.     Ideally, type I patients have ready access to a blood testing device, such as a glucometer, so that they will know when their glucose is too high or too low.

51.     Type 1 diabetics must also eat within a short window of time after their insulin has been administered. Otherwise, they can experience severe hypoglycemia.

52.     A glucometer is also a simple medical device that allows diabetics to monitor their blood sugar and adjust their diet or medication accordingly.

53.     Except for a few months in the summer of 2022 when Mr. Frey was housed at ISCC, he has never been permitted to have a glucometer, at his expense, in his medical or personal property within IDOC.

54.     Dr. Brandon Isaacs, the provider during the relevant time that Mr. Frey was at ISCC, arranged for Mr. Frey to have a glucometer.

55.     When IDOC transferred Mr. Frey back to ISCI, first to the Long Term Care Unit, he was not permitted a glucometer.

56.     Mr. Frey is now in the Medical Annex at ISCI.

57.     He still does not have a glucometer at ISCI, despite multiple requests.

58.     Dr. Haggard has not ordered a glucometer for Mr. Frey. She has told Mr. Frey that it is a security issue that is "up to IDOC." By relying on a prison policy, she is not exercising medical judgment.

59.     On the IDOC side, Mr. Frey has requested permission from Warden Tyrell Davis to allow an exception for Mr. Frey to have a glucometer in his possession. Warden Davis has ignored his requests, effectively denying them.

60.     There is no rational medical or security basis for allowing Mr. Frey to have a glucometer at one facility, with no problems, and not at another.

61.     Mr. Frey therefore has no choice when his blood is tested.

62.     Mr. Frey has no choice when his medication is administered.

63.     Mr. Frey has no choice when his food is given to him.

64.     Typically, a Centurion nurse will test glucose and administer insulin three times a day.

65.     Also typically, IDOC provides breakfast for Mr. Frey's unit at about 7:00 a.m., together with a sack lunch to be eaten later.

66.     IDOC provides dinner around 4:00 to 5:00 p.m.

67.     Insulin-dependent diabetics must consume food within a short window after their medication has been dispensed.

68.     Due to short staffing or other incompetencies, there are frequent disruptions in the schedule. The drugs are delivered too early or the meals arrive too late.

69.     Centurion Regional Health Administrator Tonya McMillian is responsible for ensuring that sufficient medical staff is hired, present, and fulfilling their duties for Centurion's patients. She is also responsible for training staff. She can develop medical policy and ensures its implementation.

70.     Ms. McMillian has failed to ensure that the on-site provider's facilities are staffed sufficiently for the number of patients that Centurion has at ISCI. This has led to poor treatment for Mr. Frey, causing him harm.

71.     Patrick Jones was the Centurion Heath Services Administrator at ISCI until sometime in 2022. In that position, he was responsible for the on-site administration of Centurion policies and procedures, and he had the authority to enact policies and procedures for Centurion patients. He failed to devise or enforce policies and procedures that would ensure adequate medical care for Mr. Frey.

72.     Jacque Dolan is now the Health Services Administrator at ISCC and has been since 2022. Like Mr. Jones, she has failed to devise or enforce policies and procedures that would ensure adequate medical care for Mr. Frey.

73.     These Health Service Administrators have failed to ensure that the provider has sufficient staff and procedures in place to ensure that diabetics, including Mr. Frey, are given insulin within a short period before they are provided food.

74.     To date, Ms. Dolan, and Summer Eldredge, have also indicated to Mr. Frey that, like an insulin pump, a glucometer is a "security issue."

75.     Ms. McMillian and Ms. Dolan have the authority to devise and implement a diabetic care policy that would permit type I residents to possess a glucometer, an insulin pump, and tightly controlled feeding and medication distribution, based on the medical need of an individual patient within a medical provider's independent judgment. These are routine treatments well within the standard of care in the community for this disease. But they have declined to do so, causing harm to Mr. Frey.

76.     Similarly, Rona Siegert is the Health Services Director for the Idaho Department of Correction. She is tasked with "[m]onitoring and overseeing all aspects of healthcare services." She has the authority to instruct the contract medical provider to provide Mr. Frey with adequate diabetic care for his condition, which in his case would access a glucometer, an insulin pump, and tightly controlled feeding and medication distribution. These are routine treatments well within the standard of care in the community for this disease. But she has declined to do so, causing harm to Mr. Frey.

77.     Warden Davis at ISCI is responsible for ensuring that his facility has sufficient IDOC security staff and ancillary employees working on-site. Security staff is responsible for when diabetic residents have mealtimes.

78.     Warden Davis routinely fails to ensure that ISCI is adequately staffed so that mission is completed.

79.     Mr. Frey often gets his insulin too early in relation to when he is given his meal, causing his blood glucose to decline dangerously.

80.     IDOC also has no menu on its meal plan that is a medical diet specific for diabetics, which would account for a consistent level of carbohydrates in each meal.

81.     The meal plans offered by IDOC all have far too many carbohydrates, and the carbs vary widely from meal to meal, for proper diabetic care.

82.     Based on all this, Mr. Frey's blood glucose and A1c levels have fluctuated widely due to the inadequate care that he is receiving in prison. This exposes him to a substantial risk of pain, suffering, and serious medical complications, including death. His diabetes is not well-controlled, yet his medical providers do not take simple and reasonable steps within the standard of care to control it.

83.     One incident stands out as illustrative of this pattern.

<u>"You're going to have a rough night."</u>

84.     Mr. Frey was housed at the Idaho State Correctional Center for a few months in the summer and fall of 2022.

85.    On September 9, at about 3:00 p.m., he was called from his unit to the Medical Unit for the "pill call" so he could receive his insulin.

86.    Sometimes, medical staff came to the units to dispense medication to the residents; other times, especially during chronic short staffing, they called residents to the Medical Unit.

87.    At the time, Mr. Frey was confined to a wheelchair because he had broken his ankle over a year before (discussed below). He needed a volunteer wheelchair pusher to get him to the Medical Unit, which was some distance from his tier.

88.    When Mr. Frey arrived at the lobby of the Medical Unit, they could see a long line of residents waiting for medication.

89.    No one from Centurion was staffing the Medical Unit.

90.    A correctional officer told them it "was going to be a long wait."

91.    Mr. Frey and his wheelchair assistant decided that they did not want to be stuck in the Medical Unit lobby during "count," which sometimes can last well over an hour.

92.    They decided to go back to their unit. Mr. Frey did not receive his insulin at that time. He believed he would have access to it later.

93.    Mr. Frey started to feel the physical effects of a rise in blood glucose. Another diabetic on the unit was also not feeling well and needed his blood tested.

94.     Mr. Frey had a glucometer during his short time at ISCC. He and the other resident used it to test their blood.

95.     Coincidentally, a Centurion Health "Correctional Medical Specialist," Nathan Thueson, was on the unit picking up paperwork.

96.     Thueson saw that Mr. Frey was sharing his glucometer. He sternly told him "that is not allowed."

97.     Mr. Frey indicated that his glucose was high and that he needed his insulin. He asked Thueson to have someone from Medical test him and give him his insulin.

98.     Thueson ignored him and left the unit.

99.     Mr. Frey's condition got progressively worse as his glucose rose. He was becoming hyperglycemic.

100.    Mr. Frey repeatedly asked the correctional officers on his unit, Officer Matthew Miller and Officer Sheikh Deen, to call Medical to help him, or, barring that, to issue an emergency so he could get his medication.

101.    He explained that he was a diabetic and he was experiencing a medical emergency.

102.    Officer Miller told Mr. Frey that he had "Nurse Hillary" in Medical, who told Miller that Mr. Frey had refused his insulin and therefore would not get any that night. Mr. Frey understands this to be Hillary Koehler.

103.     Officer Miller also spoke by phone to Nathan Thueson, who told Miller that Mr. Frey was "going to have a rough night" or that he was "going to be miserable all night."

104.     As Mr. Frey continued to suffer, either Officer Miller or Correctional Officer Sheik Deen called the Shift Commander, Lt. Jamie Ayuso. Lt. Ayuso gave them a "direct order" that Mr. Frey did not need medical assistance and not to call an emergency.

105.     Miller relayed all that information to Mr. Frey. Miller told Mr. Frey that he was "burnt," meaning he would not get any help that night.

106.     During the night and into the morning, Mr. Frey started to develop symptoms of diabetic ketoacidosis. He was sweating and urinating frequently. He was weak and faint. He was experiencing dry mouth, extreme thirst, and muscle cramps, among other symptoms.

107.     Diabetic ketoacidosis is dangerous and can lead to coma or death.

108.     Mr. Frey called his mother during the crisis, who emailed Warden Randy Valley and Lt. Ayuso, among others, telling them that her son was experiencing a diabetic emergency. No one responded to her email.

109.     Neither Correctional Officer Miller nor Officer Deen called an emergency that night.

110.     No other employee of either Centurion Health or IDOC assisted Mr. Frey.

111.    When Mr. Frey finally was able to go to the Medical Unit the next morning for pill call, "Nurse Hillary" checked his glucose. It was extremely high, somewhere in the range of 500 to 600 mg/dl. Anything over 200 mg/dl is hyperglycemia.

112.    When Mr. Frey confronted her about not helping him the night before, she said "nobody called an emergency" and something to the effect of "don't come to prison."

113.     What she did not say was that while no one called an emergency, Correctional Officer Miller had called her *on the phone*, and she refused to provide help.

114.    Mr. Frey was at great risk of serious injury or death during this incident.

115.    This is but one example of the poor quality of care that the defendants have provided for Mr. Frey's diabetes throughout his time in their custody.

<u>Inadequate Care for a Broken Ankle</u>

116.    In May of 2021, an inmate assaulted Mr. Frey. This assault resulted in a broken ankle.

117.    The break was complex and involved ligament and tendon damage.

118.    Mr. Frey was in considerable pain.

119.    Nurse Practitioner William Rogers initially decided to treat the injury conservatively. Mr. Frey was provided with a poorly fitted, second-hand air splint and wheelchair.

120.    Mr. Frey's pain did not subside, and his injury did not improve, likely due to complications from the poor management of his type I diabetes.

121.    In September of 2021, four months after the injury, he was sent to an off-site orthopedic specialist at the Coughlin Foot and Ankle Clinic in Boise.

122.    A physician's assistant at the Clinic ordered a CT scan.

123.    The Centurion providers at ISCI responsible for Mr. Frey's care, including Dr. Haggard, Nurse Rogers, Nurse Selah Worley, and Nurse Eldredge, failed to follow up expeditiously to ensure that the appointment was scheduled. To the extent that an IDOC John or Jane Doe scheduler unreasonably delayed in setting up the appointment, they are equally responsible.

124.    Mr. Frey waited over three months until he was sent off-site again for the test.

125.    When he saw the off-site provider again in December of 2021, his ankle had not improved. He was still in pain. He received the CT scan and was referred to an orthopedic surgeon, Dr. Flint.

126.    Neither Dr. Haggard, Nurse Rogers, Nurse Worley, nor Nurse Eldredge again failed to act promptly. The appointment was not scheduled until March of 2022, some three months later.

127.    Mr. Frey was then still in a wheelchair. He was still in pain. He was still awaiting a surgical opinion almost a year from the date of the injury.

128.    At the March visit, Dr. Flint examined Mr. Frey and ordered an MRI. He was considering surgical intervention but need to see the MRI to know the extent of the damage. He ordered a return visit in about four weeks. He also told Mr. Frey that IDOC and Centurion had been poorly managing his diabetes.

129.    An MRI is a common test that can be scheduled relatively quickly.

130.    There was yet another lengthy delay by medical staff at ISCI and the off-set IDOC schedulers. Mr. Frey was not scheduled to see Dr. Flint until late May of 2022, now one year since his injury.

131.    At the May visit, Mr. Frey was still in a wheelchair and still experiencing pain in his ankle.

132.    Dr. Flint concluded that surgery was needed. He ordered a pre-op visit and a surgical appointment.

133.    In June of 2022, for reasons unknown, IDOC transferred Mr. Frey from ISCI to ISCC. This significantly disrupted the continuity of his care.

134.    During the transfer, the order for a pre-op follow-up was not followed.

135.    Mr. Frey saw P.A. Robin LaRive at ISCC in June and again in July. Neither she nor the John and Jane Doe off-site schedulers ensured that the follow-up for the pre-op with the off-site provider was scheduled.

136.    In November of 2022, IDOC officials unexpectedly transferred Mr. Frey

back to ISCI and told him it was so he could have the surgery that Dr. Flint had ordered

and then he would recuperate in ISCI's Long Term Care unit.

137.    Mr. Frey finally returned to the off-site Clinic for the "pre-op"

appointment some six months after Dr. Flint ordered it.

138.    By then, Dr. Flint had left the Clinic and Mr. Frey saw a new doctor. That

doctor determined that Mr. Frey's ankle had healed on its own enough in the year and a

half since the injury that surgery was no longer warranted.

139.    Mr. Frey had been wheelchair-bound and unnecessarily in pain and

suffering for 18 months due to the repeated delays in treatment.

140.    For the first time, he was instructed to start physical therapy and get out

of the wheelchair. Physical therapy at ISCI involves meeting with a physical therapist

about once a week, who simply gives instructions for stretching and strengthening.

141.    As a type I diabetic, with comorbidities of high blood pressure, high

cholesterol, and weight gain due to an inability to exercise, Mr. Frey was at particular

risk for poor healing, pain, and worsening of these other chronic conditions during the

unnecessary and unreasonable delays in the 18 months that he was wheelchair-bound.

<u>No Treatment for Sleep Apnea</u>

142.    Mr. Frey also has another serious medical condition, sleep apnea. That

condition worsened because Centurion failed to treat his broken ankle in a reasonable

time, which kept him in a wheelchair, unable to exercise. He has gained weight and lost muscle tone.

143.    Summer Eldredge ordered a sleep study in early 2022. The study showed that Mr. Frey has sleep apnea and needed a CPAC machine to help him breathe at night.

144.    Due to repeated delays in care, neither Dr. Haggard, Ms. Eldredge, Ms. Dolan, nor Ms. Siegert followed up to ensure that Mr. Frey received a CPAP machine until December 27, 2022, some nine months after the sleep study indicated that treatment.

145.    Even then, he did not have a mask for the machine, so he could not use it.

146.    He repeatedly requested a mask from Ms. Eldredge and Ms. Dolan but did not receive one until March 6, 2023, nearly a year after the sleep study.

147.    But that mask is too small for him. He cannot use it effectively.

148.    As of the filing of this Complaint, Mr. Frey is still not being treated for his serious sleep apnea.

149.    Untreated sleep apnea can cause cardiovascular disease – particularly hypertension, stroke, coronary heart disease, and irregular heartbeats – worsen diabetes, lead to depression, and increase the risk of daytime accidents.

150.    A CPAC machine is a standard and simple treatment for sleep apnea. But Dr. Haggard, Nurse Eldredge, Ms. Siegert, and Ms. Dolan have failed to see that Mr. Frey receives that treatment in a timely and efficient manner.

## CLAIMS FOR RELIEF

### Eighth and Fourteenth Amendments

### 42 U.S.C. § 1983

### I.

### Cruel and Unusual Punishment on September 9 and 10, 2022

**Defendants Thueson, "Nurse Hillary," Miller, Deen, and Ayuso violated Mr. Frey's right against cruel and unusual punishment under the Eighth Amendment when they refused to provide him with necessary medical treatment.**

151.    Mr. Frey incorporates all previous paragraphs.

152.    These defendants were acting under color of state law.

153.    On September 9 and into September 10, 2022, Defendants Thueson, Hillary, Miller, Dean, and Ayuso were deliberately indifferent to Mr. Frey's serious medical condition; that is, each defendant knew of his serious medical condition and disregarded it by failing to take reasonable measures to address it.

154.    These defendants' deliberate indifference caused Mr. Frey harm.

## II.

### Inadequate Diabetic Care Generally

**Haggard, Young, McMillian, Jones, Dolan, Rogers, Eldredge, Worley, LaRive, Thueson, Koehler, Siegert, Davis, and Centurion Does 1 - 5 violated Mr. Frey's right against cruel and unusual punishment under the Eighth Amendment when they were deliberately indifferent to his type I diabetes, a serious medical condition.**

155.    Mr. Frey incorporates all previous paragraphs.

156.    These defendants were acting under color of state law.

157.    Diabetes is a serious medical condition.

158.    Each of these defendants has been deliberately indifferent to Mr. Frey's type I diabetes; that is, each defendant knew of his serious medical condition and disregarded it by failing to take reasonable measures to address it.

159.    These defendants' deliberate indifference caused Mr. Frey harm.

## III.

### *Monell* Liability – Type I Diabetes

**Defendant Centurion Health, Inc., and/or Centurion of Idaho, ("Centurion") had a policy, custom, or practice of denying certain treatments for type I diabetics in a prison setting. That policy, custom, or practice was the moving force behind the Eighth Amendment violation.**

160.    Mr. Frey incorporates all previous paragraphs.

161.    Centurion was fulfilling a core state duty in providing medical care to prisoners. As such, it was acting under color of state law.

162.    The Centurion employee defendants named in Count II deprived Mr. Frey of his right under the Eighth Amendment to adequate medical treatment and care for his type I diabetes.

163.    In denying Mr. Frey adequate medical treatment and care, these defendants acted pursuant to an adopted official policy or practice or custom of Centurion to deny certain diabetic treatments in a prison setting, due to cost, "security," or other non-medical considerations.

164.    Centurion's policy, practice, or custom was the moving force behind the constitutional violation, causing Mr. Frey harm.

### IV.

### Inadequate Care for Broken Ankle

**Defendants Haggard, Rogers, Eldredge, Worley, LaRive, Siegert, and IDOC Does 1 – 5 violated Mr. Frey's right against cruel and unusual punishment under the Eighth Amendment when they were deliberately indifferent to treating his broken ankle, a serious medical condition.**

165.    Mr. Frey incorporates all previous paragraphs.

166.    These defendants were acting under color of state law.

167.    A broken ankle is a serious medical condition.

26

168.     Each of these defendants has been deliberately indifferent to Mr. Frey's broken ankle and resulting pain; that is each defendant knew of his serious medical condition and disregarded it by failing to take reasonable measures to address it.

169.     These defendants' deliberate indifference caused Mr. Frey harm.

**V.**

**Inadequate Care for Sleep Apnea**

**Defendants Haggard, Eldredge, Siegert, and Dolan have violated Mr. Frey's right against cruel and unusual punishment because of their deliberate indifference to treating his sleep apnea, a serious medical condition.**

170.     Mr. Frey incorporates all previous paragraphs.

171.     These defendants were acting under color of state law.

172.     Sleep apnea is a serious medical condition.

173.     Each of these defendants has been deliberately indifferent to Mr. Frey's sleep apnea; that is each defendant knew of his serious medical condition and disregarded it by failing to take reasonable measures to address it.

174.     The defendants' deliberate indifference caused harm to Mr. Frey.

**PRAYER FOR RELIEF**

1.     WHEREFORE, Plaintiff Jacob Frey respectfully prays this Court enter judgment granting him the following:

2.     A declaration that the acts and omissions described herein violated Plaintiff's

rights under the Constitution and laws of the United States.

3.  Injunctive relief ordering Defendants Centurion, Tonya McMillian, Warden

Tyrell Davis, and Rona Siegert, or their successors, to provide Plaintiff with

effective treatment for his serious medical conditions, including but not limited

to the safe use of a glucometer, an insulin pump, access to insulin, meals timely

delivered with insulin administration, a proper diabetic diet, and frequent

exercise.

4.  Compensatory damages against each defendant in the amount to be determined

at trial, both jointly and severally, against each defendant, for serious and often

excruciating pain, suffering, unnecessary physical injury and debility, and

mental anguish.

5.  Punitive damages against each defendant in the amount to be determined at

trial.

6.  A jury trial on all triable issues.

7.  Attorney fees, costs, and expenses under 42 U.S.C. § 1988 and all relevant

statutes and rules.

8.  Any additional relief this Court deems just, proper, and equitable.

Dated this 5th day of April 2023.

/s/ Craig H. Durham
Craig H. Durham
Counsel for Plaintiff

28