## JACOB SPENCER FREY v. CENTURION HEALTH, INC. *et al.*

### Randal Stoltz Expert Report

This case was brought to me by the Moore, Elia, Kraft, and Stacey, LLP Law Firm due to my past experience reviewing correctional legal cases as well as my prior and ongoing work in correctional medicine. I have relied upon the records provided from counsel to render an opinion on the Complaint filed against the defendant(s). I have not created any exhibits of my own.

### I. Expert Qualifications

Work experience:
- Private Family Medicine practice 1987-2005
- Vanderburgh County Corrections- Jail Physician -1998-2024
- Warrick County Corrections-Jail Physician-2017-2024
- Clinical research 1988--present
- Advarra IRB (Institutional Review Board) member Nov.2018--present
- Active surveyor for NCCHC for jails and prisons in USA 2014--present
- Member of the American College of Correctional Physicians
- Volunteer faculty member for Indiana University School of Medicine

Education:
- University Southern IN—BS Biology 1976-1980
- IN University School of Medicine—MD  1980-1984
- Family Medicine Residency—1984-1987 (maintained board certification)
- Certification in Correctional Healthcare (CCHP)
- Certification as Principal Investigator in Clinical Trials (CPI)
- Annual surveyor training NCCHC for US jails and prisons
- Attendance at the annual NCCHC and American College of Correctional Physicians meetings

For further details, please see a copy of my *curriculum vitae*.

### II. Scope of Engagement:

I conducted a review of the Complaint and a review of the case related information including records provided by counsel in regard to the care provided by the DOC/Centurion medical team to Mr. Jacob Frey at the Idaho DOC facility. I formed my expert opinion on the merit of the Complaint in this case based on my education, training, and experience, especially in correctional medicine, as well as the case information provided to me by counsel.

### III. Materials Reviewed and Relied Upon to Make Findings, Reach Opinions, and Draw Conclusions:

Complaint
Medical records
Commissary records
Deposition of Rona Siegert, RN
Deposition of Dr. Rebekah Haggard, MD
Deposition of Hillary Koehler, RN
Deposition of Summer Eldredge, NP
Plaintiff's expert report from Dr. Sara Kariko, MD

### IV. Summary of Findings

**After reviewing the above materials, I am summarizing the sequence of events and generalized facts as follows:**

Mr. Jacob Frey, date of birth 4/1/1982, entered the Idaho DOC early June 2020. Medical records note on 6/9/2020 he was 6 feet 0 inches tall and weighed 245 pounds. He had numerous medical problems including diabetes mellitus, hypertension, peripheral vascular disease, neuropathy, enlarged prostate, gastroesophageal reflux, allergic rhinitis, and low back pain.

Mr. Frey had many complaints and other diagnoses were added to his problem list including headaches(9/2020), dental caries/pain(9/2020), Covid-19 positive(12/2020), sinusitis(12/2020), fracture of left fibula(5/26/2021), nausea and abdominal pain(1/2022), eye injury with inflammation(6/2022), skin rash(7/2022), constipation(8/2022), sleep apnea(11/2022), gastroparesis(1/2023), hemorrhoids(3/2023), hyperlipidemia(3/2023), and was noted to have low vitamin D blood level (3/2023).

**Complaint #1**—"poor care for diabetes"

Mr. Frey ordered large amounts of commissary food and beverage items regularly including: Maria's cookies, snack crackers, Twix bars, Bit O Honey, root beer barrels, chili ramen, Doritos spicy, sweet chili, hot spicy pork rinds, M&M plain, Gatorade lemon lime, Cherry Coke, orange soda, honey buns, squeeze cheese, other candy bars, summer sausage, and much more. He had a long list of items that he purchased weekly.

His weight gradually increased and was 275 pounds by 1/19/2021 and 280 pounds by 5/26/2021. He lost a little weight after that, but his weight stayed generally between 265-275 pounds in 2021-2022.

His blood sugar level was monitored frequently and it fluctuated considerably. His Hemoglobin A1c levels were checked periodically and generally ranged from 7.3 to 8.8.

Mr. Frey reportedly had an insulin pump prior to coming into the IDOC, but this was not continued. He also requested to have his own "keep on person" glucometer, but this was not initially given.

Mr. Frey was given insulin at the prison including baseline insulin and sliding scale insulin based on his blood sugar levels. He refused to take certain doses at times.

An incident occurred on 9/9/2022 where Mr. Frey was to be seen at the pill line for his blood sugar check and insulin administration; however, he refused to wait and left and went back to his room. He was not given an evening dose of insulin.

Mr. Frey was later given a glucometer for self- blood sugar monitoring. On 9/9/2022 Mr. Frey was caught allowing another inmate to use his glucometer which was not allowed.

### Complaint #2---"poor care for broken ankle"

My. Frey complained of left ankle pain and swelling on 5/26/2021 following an altercation with another inmate. An X-ray was ordered as well as crutches for 30 days and ice for 7 days. An X-ray showed a fracture. He was given pain medication and an orthopedic referral was ordered. On 7/22/2021, Mr. Frey was seen at the orthopedist office by a physician's assistant (PA) who noted an Xray showed a minimally displaced left distal fibula fracture. He recommended non-weight bearing conservative care and re-check in 6 weeks.

A follow-up visit with the orthopedic group was done on 9/13/2021 and Mr. Frey was still complaining of significant pain. A CT (Cat scan) scan was ordered. A CT scan on 11/2/2021 showed a minimally displaced fracture, but there was a question of delayed bone union or nonunion and possible cartilage issues, thus an MRI was recommended. Mr. Frey saw the PA again on 12/6/2021 and it was recommended that Mr. Frey see an orthopedist at their office. An appointment was completed on 3/22/2022 and an MRI was recommended and a follow up in 4 weeks. An MRI on 5/10/2022 showed a healing, well aligned fracture. On 5/19/2022 Mr. Frey saw the orthopedist Dr. Flint and surgery was recommended. Dr. Flint left that office and thus surgery did not get scheduled. Mr. Frey still complained of ankle pain and was sent back to the orthopedic office and saw Dr. Hirose on 11/14/2022. Dr. Hirose felt the ankle fracture appeared to be healing; however, Mr. Frey seemed to have tendon pain, thus he referred him to interventional radiology for a peroneal tendon sheath injection. He also ordered a repeat CT scan. The CT scan was done on 12/8/2022 which showed the fracture was mostly healed. Mr. Frey had the tendon injection done on 12/28/2022. A bone stimulator was also ordered 1/18/2023. A follow up note on 4/7/2023 noted "no pain left fibula and no infection" follow up as needed.

### Complaint #3---"delays getting CPAP and night mask"

Mr. Frey did not complain to the medical staff about wanting a CPAP machine until he put a medical request in on 3/24/2022 (after he had already been in IDOC for nearly 2 years).

On 4/18/2022, Mr. Frey put in a second request. Request for outside records for verification and recommendations regarding this was made. A sleep study was subsequently ordered and done on 10/14/2022. It revealed moderate obstructive sleep apnea and CPAP was recommended and it was subsequently arranged. Mr. Frey complained on 3/7/2023 that his mask was to small. Initially a full-face mask was given, then an extra-large mask was given on 4/10/2023. Mr. Frey was re-fitted for another mask on 5/22/2023.

### Response to Plaintiff's expert report from Dr. Sara Kariko

Dr. Kariko wrote a rather lengthy report which has flaws within it and is quite overly harsh on the care provided by the IDOC medical staff.

Page 2 states "On 7/6/21, Mr. Frey was seen for his follow up appointment with NP Rogers and due to the delayed healing of the ankle fracture, an order was placed for an urgent orthopedic consultation" then "On 7/22/21, Mr. Frey was seen at the Saint Alphonsus Coughlin Clinic (orthopedic clinic) by PA Chorn". However, Dr. Kariko states on page 3 "Delaying follow-up for approximately a month to assess for complications is unacceptable. In addition, the orthopedic consultation that was ordered as "urgent", was not completed until 42 days after the referral was placed". From 7/6 to 7/22/2021 is not 42 days. This is one example of several timelines set forth in Dr. Kariko's report where she seems to place all the blame squarely on the Defendants for any apparent delay in setting offsite care visits. This denies the multifaceted procedure of scheduling 1000+ inmates for offsite care visits, which is dependent not only on the care providers' availability, but also on having correctional officers available to escort inmates, having available transportation, etc. There were many facets of scheduling that are outside the control of the medical provider that is requesting the offsite visit.

Page 4 states "It is important to note that just because a patient does not constantly write stating that they are in pain does not mean that their pain should be questionable"; however, after reviewing the medical records, Mr. Frey was not shy at all to put in medical complaints/requests. If he was in significant pain then those requests would have likely been submitted. Mr. Frey put in multiple requests for pain medication later.

Page 15 states "The fact that Mr. Frey was not provided access to meals after receiving insulin is not only dangerous but another sign of deliberate indifference. Diabetic patients must be provided with meals within a specific timeframe of receiving insulin or it is unsafe to administer without discussing dose adjustment with the ordering prescriber." I would imagine the Dr. Kariko did not review Mr. Frey's weekly commissary orders or Nurse Eldridge's deposition testimony. Mr. Frey had access to numerous sugary commissary snacks that would raise his blood sugar. Additionally, Nurse Eldridge testified that diabetic inmates are provided their insulin at certain times and then they go straight to the dining hall to pick up their meal (Eldridge, pp. 37-38). She further testified that long-acting insulin called "Regular" is provided before meals so there is additional time to get a meal if there is some issue with receiving a meal directly after insulin dosage. (Eldridge, pp. 23-24).

Page 18 states "On March 4th (2022), Mr. Frey sent an HSR stating "I use a CPAP machine outside of prison"; however, there was no mention that he had been in prison for quite some time without a CPAP machine or putting a request in for it.

On page 24, there was no mention that Mr. Frey was at high risk for surgery complications if he would have had foot/ankle surgery and that he was likely fortunate to let time heal and thus avoid surgery. As far as the diabetic management goes, there was no mention of his weekly commissary purchases and subsequent weight gain that likely led to Mr. Frey's high blood sugars and difficulty managing them.

It is also interesting that Dr. Kariko never mentioned the Covid-19 pandemic that was going on during this time period and even that Mr. Frey tested positive at one point. The Covid pandemic led to multiple and often significant delays in the healthcare world.

Dr. Kariko was very adamant about deliberate indifference and not meeting standard of care; however, Mr. Frey's issues were addressed. Mr. Frey had some self-responsibility to help control his diabetes (i.e. diet and avoiding commissary items that are not good for diabetics and keeping weight down). Also, it was not mentioned that when Mr. Frey was allowed to have his own glucometer, he did not follow the rules and shared it with another inmate.

### V.   Discussion and Conclusions

I have reviewed the above records in relation to this case. I have based my expert opinion on the care and recommendations provided by the Centurion IDOC medical staff based on my education, training, and experience especially in correctional medicine.

It must be first pointed out that during most of the time of Mr. Frey's complaints the nation was under a Covid-19 pandemic and many medical services were on-hold or delayed. Delays related to Covid-19 could not be controlled by the Centurion medical staff. It was also not mentioned in the complaint that Mr. Frey himself had a positive Covid-19 test result which led to isolation.

Diabetes is a medical condition that is dependent on the patient to take care of themself. Providers can help manage and make recommendations, but if patients don't cooperate, then good control is not possible. Mr. Frey ordered an enormous amount of commissary items weekly that would adversely affect his blood sugars. Medical providers counseled him on the commissary food, as well as exercise, several times. He was able to propel himself around in his wheelchair on occasion, as he was seen doing, and this could have been good exercise for him. (Eldridge, p. 85). Instead, he insisted on having a wheelchair pusher.

Mr. Frey gained a substantial amount of weight which will worsen diabetes control. Diet, exercise, weight loss if overweight, and appropriate medications are all necessary components for proper diabetes control. There was no evidence of brittle diabetes in the chart documents for Mr. Frey. Brittle diabetes tends to result in severe fluctuations in blood sugar levels as well as frequent hospitalizations for which Mr. Frey did not have. Mr. Frey complained about not receiving his insulin one night; however, he was the one that refused to wait in the pill line to receive it. There was no injury to him from not receiving it that single night. In fact, receiving insulin late in the night when he was scheduled to receive morning insulin could cause him to go hypoglycemic. He was well aware of this potential (refused "stacking" insulin" and refused late insulin on occasion when he was close to time for his next scheduled insulin (See 8/14/22). There would be much more potential for injury and long-term consequences in not being compliant with his total care over a long period. He did this on multiple occasions. Refused mid-day insulin and then called an emergency on 8/14/22; refused insulin 11/1/22; refused insulin 11/2/22; 11/5/22; 11/6/22; 11/7/22; 11/9/22; 11/12/22; 11/13/22; 11/15/22; 11/16/22; 12/1/22; 12/2/22; 12/07/22; 12/10/22 (refused sliding scale because he was below 300); 1/10/23; 1/13/23; 1/14/23; and 1/20/23.

Mr. Frey also complained about not receiving an insulin pump. These are rarely used in correctional settings for safety of the inmate. Other inmates could rip these out and potentially use the electronics for other purposes. Mr. Frey was known to get into altercations. Mr. Frey also wanted his own

5

glucometer. Once again, these are rarely handed out in the correctional environment; however, later a trial at this prison allowed Mr. Frey to have a glucometer. He then did not follow the rules and allowed another inmate to use it. A glucometer may make it easier to control diabetes, but it is not necessary for a diabetic like Mr. Frey until he takes serious management in his own care. His diabetes was fairly well controlled for periods of time (See notes 5/06/22 - A1c is 7.3). However, Mr. Frey also did not follow recommended doses of insulin on numerous occasions

Mr. Frey broke his ankle after an altercation with another inmate. He was evaluated properly by the medical staff and X-rays and appropriate orthopedic referrals were made. The medical unit followed the conservative care plan set forth by the orthopedic clinic. After visits to the orthopedic clinic, the prison medical unit did not make independent medical decisions regarding the fracture. The orthopedic office had their PA see Mr. Frey on a couple occasions before he got to see the orthopedic physician. This was out of control of the IDOC medical team. CT and MRI scans were done. The PA referred Mr. Frey to see an orthopedist at their office. Then the original orthopedist who saw Mr. Frey was no longer available to follow-up with him. He was rescheduled with another orthopedist who took over management of his condition. He felt that surgery was not necessary, since the prior fracture was healed. He referred Mr. Frey for a tendon injection and a bone stimulator was ordered. Mr. Frey's pain reportedly went away and fortunately no infection occurred. With surgery Mr. Frey would have been at high risk for complications and healing with his diabetes. It was unfortunate that Mr. Frey had to use a wheelchair for a time, but once again this was much dependent on the orthopedic office evaluations and timing. Additionally, the healing process may have been delayed further from a second injury to the fracture on March 23, 2022 (complained of in medical records on April 18, 2022).

The CPAP complaint timing was interesting in that Mr. Frey had already been in prison for almost 2 years. If is was that critical, then he could have brought that issue up with the medical staff on intake. It did take some time to get testing done and a proper fitting face mask, but once again this had no significant permanent issues on his overall health. In addition, part of the issue with fitting was that he was instructed that he needed to shave his beard for a proper fitting and he refused to do so.

A long list of service requests from the Centurion medical staff in regards to Mr. Frey's diabetes, fractured ankle, and sleep apnea were all approved. As mentioned above, there is much coordination in a prison setting to get all the appointments arranged and much of that is outside the control of the Centurion medical staff.

In conclusion based on the records and depositions provided, my Expert Opinion is that the Centurion medical staff at the IDOC, acted within the Standard of Care based on the lack of cooperation by Mr. Frey as well as being timely as possible during a national pandemic. I reserve the right to modify my opinion if new information becomes available in this case.

Respectfully submitted,

*[signature]*

Randall Stoltz, MD, CCHP    6